Stephen H.M. Bloch (UT #7813)
Hanna Larsen (UT #18458)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
hanna@suwa.org

Attorneys for Plaintiff
Southern Utah Wilderness Alliance

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br>       Plaintiff,<br><br>v.<br><br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES BUREAU OF LAND MANAGEMENT, and LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary for Land and Minerals Management,<br><br>       Defendants. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br><br>Case No. 2:23-cv-00492<br><br>Judge |

## INTRODUCTION

1.      Pursuant to District of Utah Local Civil Rule 7.4, Plaintiff Southern Utah

Wilderness Alliance ("SUWA") seeks judicial review of defendant Bureau of Land

Management's ("BLM") 2019 decision to approve nearly 125,000 acres of potash mining in Utah's remote West Desert, known as the Sevier Playa Potash ("SPP") Project.

2.  On August 27, 2019, former Assistant Secretary for Lands and Minerals Management Joseph R. Balash[1] signed the Record of Decision ("ROD") approving the SPP Project.[2] The decision is final and subject to this Court's review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Specifically, SUWA seeks the Court's review under the APA for violations of the National Environmental Policy Act ("NEPA").

3.  Sitting between the Cricket Mountains to the east and the Notch Peak Wilderness Study Area ("WSA") to the west, the 125,000-acre Sevier Lake is located in a remote and largely undisturbed area of Utah's West Desert; an area that is currently entirely devoid of light or noise pollution. Like the Great Salt Lake, Sevier Lake is a highly saline terminal lake that is a remnant of Lake Bonneville. Although it is fed by the Sevier River, upstream water diversions cause Sevier Lake to be largely dry during certain times of the year. When Sevier Lake contains surface waters, as it does during high precipitation years, it supports important stop-over habitat for the millions of migratory birds in the Pacific Flyway.

---

[1] As of the date of filing this complaint, the position for Assistant Secretary for Land and Minerals Management is vacant. Current Principal Deputy Assistant Secretary for Land and Minerals Management Laura Daniel-Davis is named in lieu of former Assistant Secretary Balash.

[2] Bureau of Land Mgmt, Sevier Playa Potash Project Record of Decision, 3 (Aug. 2019) ("SPP Project ROD"). Available at:
https://eplanning.blm.gov/public_projects/nepa/67624/20002405/250002832/Sevier_Playa_Potash_Project_Record_of_Decision_190827_signed.pdf


Taken from the House Range – Distant vistas of the Sevier Lake reveal an overwhelming natural landscape.


Taken from the House Range – This setting gives visitors a feeling of solitude and remoteness unparalleled in most of the United States.

4. BLM's decision allows Peak Minerals, Inc. ("Peak Minerals")[3] to conduct large-scale surface mining operations and develop rights-of-way ("ROWs") across the entire Sevier Lake bed (95 percent of the Peak Mineral's leased lands are administered by BLM). Once initiated, the Project is anticipated to last thirty-two years and is expected to produce approximately 372,000 tons per year of potassium sulfate (sulfate of potash). To support such a large-scale operation, BLM's decision authorized the construction of evaporation ponds, dikes, roads, powerlines, a processing plant, and a rail loadout facility. In essence, industrial development of this magnitude will eliminate the wild and remote nature of Sevier Lake and the surrounding lands, significantly impair important habitat for migratory birds, and drastically affect important resource values including air quality, water quality and quantity, and visual resources.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief); and the Administrative Procedure Act ("APA") 5 U.S.C. §§ 701-706.

6. Venue is proper in this Court under 28 U.S.C. § 1391(e) because it is where a substantial part of the events or omissions giving rise to the claims occurred and the federal public lands at issue are situated in this district.

## PARTIES

---

[3] At the time the ROD was issued, Peak Minerals, Inc. was doing business as Crystal Peak Minerals ("CPM") and is referred to as such throughout all BLM documents. *See* SPP Project ROD at 1.

7. Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE is a non-profit environmental membership organization. Founded in 1983, SUWA is dedicated to the preservation of the outstanding wilderness found throughout Utah and the management of wilderness-quality lands in their natural state for the benefit of all Americans. SUWA is headquartered in Salt Lake City, Utah. SUWA members use and enjoy BLM-managed lands throughout Utah for a variety of purposes, including recreation, wildlife viewing, cultural appreciation, and aesthetic appreciation, including the public lands threatened by the SPP Project. SUWA members also have an interest in seeing BLM comply with the procedural requirements of federal environmental laws like NEPA which ensures that BLM will at least make fully informed if not environmentally sound decisions.

8. For years, SUWA and its members have worked to protect wilderness-quality lands in Utah because, *inter alia*, those areas support environmental values of significant importance including air quality, migratory birds and other wildlife, visual resources, and water resources. Thus, SUWA and its staff and members have direct interests in the SPP Project challenged in this action.

9. SUWA's staff and members regularly use and enjoy the public lands that will be impacted by the SPP Project for a variety of purposes, including hiking, recreation, photography, wildlife viewing, solitude, and aesthetic appreciation of the surrounding area's natural and wild values; and intend to continue doing so.

10. In addition, SUWA members Ray Bloxham and Jack Hanley have spent considerable time visiting and working to protect the lands surrounding the SPP Project, including the Red Tops and Cricket Mountain citizen-proposed wilderness units, and the Notch

Peak, King Top and Wah Wah Mountain WSAs.[4] Mr. Bloxham has hiked in the both Cricket Mountains and the Notch Peak WSA, from which he can see the Sevier Lake bed and the lands that will be directly disturbed and impacted by the approved SPP Project. When Mr. Bloxham visits these areas, he enjoys the vastness and emptiness of the Sevier Lake bed, especially when it has standing water that provides spectacular reflections of clouds and surrounding land features. In partnership with BLM, Mr. Hanley has run volunteer stewardship projects in the Swasey Mountain, Notch Peak, Wah Wah Mountain, King Top WSAs since 2018. The impacts of the SPP Project will be felt in places like the Notch Peak, King Top and Howell Peak WSAs by increased light pollution, as well as dust and noise, generated by project operations even if the lakebed is not directly in view.

11. Mr. Bloxham and Mr. Hanley intend to continue visiting the Sevier Lake bed and surrounding BLM-managed lands. For example, Mr. Bloxham has plans to visit the Sevier Lake area in fall of 2023 when he intends to drive along the western reaches of the lake bed to travel between the House Range and the Wah Wah Mountains.

12. SUWA participated extensively in BLM's processes for approvals of the SPP Project ROD and has exhausted all legally required administrative remedies before bringing this action.

13. BLM's violations of NEPA and the APA in approving the SPP Project ROD have already and will continue to injure the interests of SUWA and its staff and members. The relief sought herein would redress these injuries. SUWA has no other adequate remedy at law.

---

[4] The Red Tops and Cricket Mountain citizen-proposed wilderness units and the Notch Peak, King Top, Wah Wah Mountain WSAs are, among others, currently proposed for wilderness designation in America's Red Rock Wilderness Act, H.R. 3031, S. 1310 (118th Congress).

14. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is responsible for overseeing the management of approximately five hundred million acres of federal public land across the United States, including those managed by BLM in Utah, for a variety of competing resources, including the protection of the natural and human environment.

15. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is a federal agency within the Department of the Interior and manages approximately twenty three million acres in Utah. BLM manages the public lands in the and around the SPP Project area in accordance with the Federal Land Policy and Management Act ("FLPMA"), NEPA, their implementing regulations and relevant policies, and other requirements of law. BLM is the agency responsible for drafting and issuing the SPP Project ROD.

16. Defendant LAURA DANIEL-DAVIS is sued in her official capacity as Principal Deputy Assistant Secretary for Land and Minerals Management exercising the authority of Assistant Secretary for Land and Minerals Management. Ms. Daniel-Davis oversees programs within the Department of Interior associated with public land management and minerals leasing and operations on public lands, including such programs administered by BLM. The Assistant Secretary for Land and Minerals Management is the officer responsible for approving the SPP Project ROD.

## LEGAL FRAMEWORK

### I. Administrative Procedure Act

17. Judicial review of agency actions under NEPA and its implementing regulations is governed by the APA, which provides judicial review for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute." 5 U.S.C. § 702. Review is limited to "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

18. Under the APA, a reviewing court "shall…hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency actions may also be set aside where the action is "without observance of procedure required by law." *Id.* § 706(2)(D).

## II.     National Environmental Policy Act

19. Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.[5] NEPA is our nation's "basic charter for protection of the environment." 40 C.F.R. § 1500.1(a). It has two primary objectives: (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental consequences in their decision-making. *Id.* § 1500.1(c).

20. NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental effects." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Thus, NEPA requires that federal agencies prepare an Environmental Impact Statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), to ensure fully informed decision-making and provide for public participation in environmental

---

[5] On June 3, 2023, Congress amended NEPA as part of the Fiscal Responsibility Act of 2023. Pub L. No. 118-5 (June 3, 2023). In addition, the Council on Environmental Quality's revised NEPA regulations went into effect on September 14, 2020. *See generally*, 85 Fed. Reg. 43304 (July 16, 2020). However, because the FEIS and ROD were issued in 2019, all citations to NEPA's statutory and regulatory provisions are to the versions in effect in 2019. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, --- F.4th--- 2023 WL 4411858, *5 n.6 (10th Cir. 2023).

analysis and decision-making processes. 40 C.F.R. § 1500.1(b)-(c). NEPA and its implementing regulations require, among other things, that an EIS fully explore and consider all reasonable alternatives to the proposed action, *id.* § 1502.14(a), and analyze the short- and long-term direct, indirect and cumulative effects of each alternative. *Id.* §§ 1502.16, 1508.7, 1508.8, 1508.27(a); *see also* 43 C.F.R. § 46.415. This information must be made available to agency officials and the public "before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

## FIRST CAUSE OF ACTION
*Violation of NEPA: Failure to Analyze a Range of Reasonable Alternatives*

21. SUWA incorporates by reference all preceding paragraphs.

22. Alternatives to the proposed action are the "heart of the environmental impact statement," 40 C.F.R. § 1502.14, and BLM is obligated to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). In doing so, BLM must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

23. The range of reasonable alternatives is determined by the proposed project's purpose and need statement, which must describe BLM's–not the project proponent's–purpose and need. 40 C.F.R. § 1502.13; 43 C.F.R. § 46.420(a)(2) ("It is [BLM's] purpose and need for action that will determine the range of alternatives and provide a basis for the selection of an alternative in a decision."). "The broader the purpose and need statement, the broader the range of alternatives that must be analyzed." Bureau of Land Mgmt., NEPA Handbook H-1790-1§ 6.2.1 (Jan. 2008) ("BLM NEPA Handbook").

24.     "BLM is required to analyze all reasonable alternatives to the proposed action, which includes those alternatives that are significantly distinguishable from the alternatives already considered." *Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169, 1186 (D. Utah 2020) (emphasis added) (citations and quotations omitted). When considering recommended alternatives, BLM cannot "confuse[] the power to act with the requirement to analyze." *Id.*

25.     BLM's stated purposes for the SPP Project are broad: 1) to "consider [Peak Minerals'] proposed Mining Plan for use of federal lands and development of federal minerals" consistent with its lease rights and 2) to "consider [Peak Minerals'] requests for ROWs and mineral material sales associated with the proposed Mining Plan." SPP Project ROD at 3. BLM's stated need is likewise broad: "[to] provide for the mining of potash on the public domain and require the BLM to respond to ROW grant requests while avoiding or minimizing adverse effects, in conformance with existing land use plans." *Id.*

26.     The Final Environmental Impact Statement ("FEIS") for the SPP Project included the Proposed Action (which would adopt Peak Minerals' Mining Plan and grant requested ROWs), five alternatives to the Proposed Action, and the NEPA-required No Action Alternative. *See* Bureau of Land Mgmt, Sevier Playa Potash Project Final Environmental Impact Statement, ES 2-4 (July 2019) ("SPP Project FEIS").[6]

27.     None of the five action alternatives represent a middle-ground alternative. Rather than "rigorously explore and objectively evaluate," 40 C.F.R. § 1502.14(a), a broad range of alternatives "that fall between the obvious extremes" of the Proposed Action and No Action

---

[6] Available at: https://eplanning.blm.gov/public_projects/nepa/67624/20000255/250000306/SevierPlayaPotash-SPP-Project_FEIS.pdf

10

alternatives, *Colo. Envt'l Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999), the five action alternatives represent minor "variations of specific Project components…in which only certain components are changed…while the remainder of the proposed action would be implemented as described." SPP Project FEIS at ES-3; *see also id.* at ES-5-11 tbl. ES-1 (comparing environmental effects of the Proposed Action and each action alternative and demonstrating that nearly all environmental effects of <u>each</u> alternative are the same as the Proposed Action).

28. In choosing the SPP Project alternatives to analyze in detail, BLM rejected and did not fully analyze several reasonable middle-ground alternatives that would meet BLM's stated purposes and need, including one proposed by SUWA. *See generally*, SPP Project FEIS App. J. Deemed the LUMA[7] alternative, SUWA's recommended alternative would have reduced the overall footprint of the project and protected crucial wetland habitat by excluding development on the northern end of the lakebed while still allowing minerals extraction on the southern portion of Sevier Lake.

29. BLM's decision not to analyze in detail the LUMA alternative (or any other middle-ground alternative) and instead only consider slight variations of the Proposed Action that each have nearly identical environmental impacts violates NEPA and its implementing regulations and is arbitrary, capricious and otherwise contrary to the law in violation of the APA. 5 U.S.C. § 706(2).

**SECOND CAUSE OF ACTION**
*Violation of NEPA: Failure to Take a Hard Look at Environmental Impacts*

---

[7] At the time BLM issued the SPP Project FEIS and ROD, a subset of the potash leases included in the SPP Project were held by LUMA Minerals, LLC. Since then, Peak Minerals acquired all leases involved in the Project.

30. SUWA incorporates by reference all preceding paragraphs.

31. NEPA and its implementing regulations require BLM to take a "hard look" at the environmental impacts of proposed actions. 42 U.S.C. § 4332(C)(i).

32. Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." 40 C.F.R. § 1508.5(a).

33. Indirect impacts are "caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

34. Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

35. Additionally, NEPA requires BLM consider in its analysis "[b]oth short- and long-term effects." 40 C.F.R. § 1508.27(a).

36. Throughout the SPP Project's NEPA process, SUWA submitted extensive comments highlighting potential impacts on a number of environmental resources including, but not limited to, water (ground water and water quality), climate, air quality, visual resources, and migratory birds.

37. BLM failed to take a hard look at the direct, indirect, and cumulative impacts of approving the Proposed Action on the aforementioned resources.

38. For example, BLM failed to analyze the impacts of a reasonably foreseeable future action—the West Desert Water Supply and Conservation Project (formerly known as the

Pine Valley Groundwater Development and Pipeline Project)—even though it would pump water from the same regional aquifer as the proposed freshwater supply for the SPP Project. Instead, BLM entirely deferred this analysis to a later date, in the West Desert Water EIS. BLM also failed to take a hard look at the SPP Project's impacts to water quality where it discharges at Fish Springs National Wildlife Refuge, an acknowledged part of the regional aquifer system.

39. BLM's failure to analyze these impacts violates NEPA, its implementing regulations, and is arbitrary, capricious, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

WHEREFORE, SUWA respectfully requests that this Court enter judgment in its favor and against Defendants and provide the following relief:

1. Declare that Defendants have violated NEPA, its implementing regulations, and the APA by approving the SPP Project ROD;

2. Declare unlawful and set aside the SPP Project FEIS and ROD;

3. Enjoin Defendants from taking any actions pursuant to the SPP Project FEIS or ROD until they have complied with NEPA, its implementing regulations, and the APA;

4. Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein;

5. Award Plaintiff the costs it has incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable provisions; and

6. Grant other such relief the Court deems just and proper.

Respectfully submitted this 31st day of July, 2023.

/s/ *Hanna Larsen*
Stephen H.M. Bloch
Hanna Larsen

*Attorneys for Plaintiff Southern Utah Wilderness Alliance*